IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CV-187-FL

| | | |
|---|---|---|
| HARLEYSVILLE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | ORDER |
| HARTFORD CASUALTY INSURANCE COMPANY; ASSURANCE COMPANY OF AMERICA; FIRST FINANCIAL INSURANCE COMPANY; FIRST MERCURY INSURANCE COMPANY; G.R. HAMMONDS, INC., also known as G.R. HAMMONDS ROOFING, INC., also known as HAMMONDS ROOFING; HARTFORD FIRE INSURANCE COMPANY | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on motions for summary judgment by defendant First Mercury Insurance Company ("First Mercury") (DE 110); plaintiff Harleysville Mutual Insurance Company ("Harleysville") (DE 111); defendant Assurance Company of America ("Assurance") (DE 117); and defendant First Financial Insurance Company ("First Financial") (DE 126). Also before the court is a motion for summary judgment or for partial summary judgment by defendants Hartford Casualty Insurance Company and Hartford Fire Insurance Company (collectively, "Hartford") (DE 114), together with Hartford's motion to seal certain exhibits (DE 121). The motions have been fully briefed, and the issues raised are ripe for ruling.

## BACKGROUND

Harleysville filed an amended complaint in this action on November 17, 2011, seeking entry of a declaratory judgment regarding the relative rights of the parties under policies of commercial general liability insurance issued by Harleysville, Hartford, Assurance, First Financial, and First Mercury (the "insurance companies"), to defendant G.R. Hammonds, Inc. ("Hammonds"). Harleysville seeks a judgment declaring and adjudging whether and to what extent coverage is afforded under the respective policies of the insurance companies as a result of claims asserted against Hammonds in three sets of underlying state court lawsuits. The claims asserted against Hammonds in the underlying lawsuits arise out of allegedly defective roofing work performed by Hammonds at three multi-family residential construction projects, commonly known as Concord West, Southampton Pointe, and Vista Cove.

First Financial answered the amended complaint on December 7, 2011, seeking a declaratory judgment that the First Financial insurance policy does not provide coverage to Hammonds for any of the underlying lawsuits, and that First Financial owes nothing to any other party to the lawsuit. Assurance also answered denying coverage under its policy, but also seeking by way of counterclaim against plaintiff a determination whether and to what extent coverage is afforded under the insurance companies' respective policies, in the event the court determines that more than one policy provides coverage. Hammonds filed an answer on December 9, 2011, asserting numerous defenses, including that plaintiff has an obligation to defend and indemnify Hammonds in the underlying lawsuits. First Mercury answered on February 28, 2012, asserting numerous defenses, including that the First Mercury insurance policy does not provide coverage for the underlying lawsuits.

2

In the meantime, on December 14, 2011, Hartford moved to dismiss or stay the present lawsuit, in favor of resolution of the dispute in South Carolina. The court denied the motion by order entered May 18, 2012. The court entered a case management order on May 21, 2012, providing for discovery, in reference to the parties' joint report and plan, on the subject of the construction of the underlying projects, and the claims and settlements arising out of such construction. Upon plaintiff's unopposed motion, the court also consolidated with the present action one other prior-filed declaratory judgment action, Case No. 7:11-CV-98-FL, raising overlapping coverage issues regarding the underlying Southampton Pointe lawsuit.[1]

On December 21, 2012, Hartford filed an answer, asserting several defenses, including that indemnity for the underlying Concord West and Southampton Pointe lawsuits should be decided in South Carolina state court, or, if decided in this court, that Hartford is entitled to contribution from the other insurance companies in the amount of those parties' reasonable shares. Hartford also moved to stay this action pending resolution of an appeal to the Fourth Circuit Court of Appeals of an order by the District of South Carolina denying Hartford's motion to remand that action to South Carolina state court, and dismissing the case in favor of the present matter.

On February 27, 2013, the court stayed this action pending Hartford's appeal to the Fourth Circuit of the District of South Carolina order. On November 15, 2013, the Fourth Circuit affirmed the District of South Carolina order denying remand and dismissing the matter in the District of South Carolina. Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 263 (4th Cir.

---

[1] The consolidation order directed all future documents in the consolidated cases to be filed in the present action, and that the consolidated action be controlled by the case management order in the present case. While Case No. 7:11-CV-98-FL remains open on the docket, it is not an active case, and the relief sought in the present matter encompasses that sought in Case No. 7:11-CV-97-FL. Therefore, the court DIRECTS the clerk to CLOSE the case file in Case No. 7:11-CV-98-FL. Two other prior actions raising overlapping coverage issues related to the Concord West and Vista Cove underlying lawsuits, Case No. 7:11-CV-97-FL, and Case No. 7:11-CV-99-FL, were already voluntarily dismissed.

2013). Thereafter this court lifted the stay entered previously and entered an amended case management order providing amended deadlines for completion of discovery and dispositive motions.

In their motions for summary judgment filed May 22, 2014, Harleysville, Assurance, First Financial, and First Mercury each contend that coverage for claims asserted in the underlying lawsuits should be triggered according to the date of completion of construction, which date they contend falls within the time period solely of Hartford's insurance policy, with respect to the Concord West and Southampton Pointe projects. With respect to the Vista Cove project, by contrast, which involved several different construction phases, Harleysville and Assurance contend that coverage may extend, in differing respects discussed further herein, to all policies except that of First Mercury. First Financial and First Mercury separately contend that an exclusion in their policies bars coverage for any of the underlying lawsuits.

Hartford, by contrast, asserts in its motion for summary judgment that coverage is determined according to the date of injury-in-fact, in the form of damages from water intrusion, which it contends is a date that may fall any time between completion of construction and the time of the underlying lawsuits. Accordingly, Hartford contends that indemnity for settlement costs should be afforded under each of the policies of the insurance companies, on a pro rata "time-on-risk" basis. Hartford also contends that the court should limit its judgment to a declaration of indemnity obligations and not address defense costs, although it proposes a similar trigger of coverage in the event defense costs are allocated by the court.

Hammonds responded to the insurance companies' motions for summary judgment, asserting that it is covered under one or more of the insurance companies' policies, and taking a neutral

position on the proper trigger of coverage under such policies. Hammonds also contends that the exclusions asserted by First Financial and First Mercury are inapplicable.

The parties submitted or referenced in the record the following evidence in conjunction with their motions for summary judgment: (1) the operative complaints in each of the underlying lawsuits, including exhibits attached thereto (DE 34-10 to -25); (2) the insurance companies' policies issued to Hammonds (DE 34-1 to -9; DE 112-1 to -3; DE 116-1 to -8); (3) responses to interrogatories (DE 112-5; 113-6 to -10; DE 118-4 to -7); (4) responses to requests for admissions (DE 113-1 to-6); (5) affidavit of Matthew Day, a Harleysville claims evaluator, in support of Harleysville's motion for summary judgment (DE 113-10); (6) declaration of Laura Johnson Evans, defense counsel for Hartford in the underlying Concord West and Southampton Pointe lawsuits, in support of Hartford's motion for summary judgment (DE 115); (7) expert reports submitted in each of the underlying lawsuits (DE 113-9; DE 118-1 to -2); (8) excerpts of Hammonds's subcontract for the Vista Cove project (DE 118-3); (9) proposed sealed exhibits containing confidential case assessments by Hartford's counsel in the underlying Concord West and Southampton Pointe lawsuits (DE 120 and 120-1);[2] (10) a complaint filed in state court by First Mercury seeking declaratory relief regarding insurance coverage for other construction projects, and Hartford's answer thereto (DE 130-1 to -2).

## STATEMENT OF UNDISPUTED FACTS

Hammonds conducts business in the construction industry, primarily as an installer of roofs on buildings. (E.g., DE 113-6, p.6). Hammonds was insured under commercial general liability

---

[2] Because these exhibits contain confidential attorney work product and case assessment analysis, the court finds good cause to seal these exhibits pursuant to the March 27, 2014, stipulated protective order. Accordingly, Hartford's motion to seal (DE 121) is GRANTED.

5

policies issued by Hartford, Assurance, First Financial, Harleysville, and First Mercury, for the following periods of time:

1.      Hartford from October 27, 1998, to February 10, 2002;

2.      Assurance from October 26, 2001, to October 26, 2002;

3.      First Financial from October 28, 2002, to October 28, 2003;

4.      Harleysville from October 28, 2003, to October 28, 2006; and

5.      First Mercury from October 28, 2006 to October 28, 2009.

Each of these policies provided, in pertinent part, coverage for "property damage" liability, in terms identical in material part to the following:

[COVERAGES]

We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" . . . to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .

This insurance applies to . . . "property damage" only if:
(a) The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
(b) The . . . "property damage" occurs during the policy period.

[DEFINITIONS]

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(e.g., DE 34-3, pp. 14,[3] 27-28 (Harleysville); see also DE 34-1 to -9 (Harleysville); DE 116-1 to -4 (Hartford); DE 41-1 to -3 (Assurance); DE 126-1 (First Financial); DE 112-1 to -4 (First Mercury)).

A.    Concord West

In 2009, Hammonds was first named as a defendant in a lawsuit filed in state court in South Carolina, Concord West of the Ashley Homeowners Assoc., et al. v. G.R. Hammonds, Inc., et al., No. 2008-CP-10-1659.  The plaintiffs in this underlying lawsuit (hereinafter the Concord West plaintiffs") alleged in a Ninth Amended Complaint filed in August 2010 that Hammonds performed "roofing work as a subcontractor during the original construction of the property which is the subject of this action."  (DE 34-12 ¶ 367).  Hammonds, among other contractors, is referred to in the complaint as one of the "Original Contractors."  (Id. ¶ 378).

The Concord West plaintiffs alleged that the Original Contractors entered into contracts to construct 18 buildings, comprising 408 rental units, collectively known then as Ashley Knoll Apartments, which allegedly were completed in approximately February 2000.  (Id. ¶ 388). Other groups of defendants were alleged to have converted the Ashley Knoll apartments to condominiums in 2005, ultimately known as Concord West of the Ashley Condominiums. (DE 34-12, ¶ 337; 397). For ease of reference, the court refers to the project as Concord West throughout this order.

With respect to the Original Contractors, including Hammonds, the Concord West plaintiffs alleged that these defendants "performed insufficient, shoddy, negligent work and . . . failed to comply with applicable building codes and industry standards[,] which has contributed to and resulted in the premature dilapidation of the property which is the subject of this action and property

---

[3]  Throughout this order, references to page numbers in filed documents refer to the page number designated upon viewing the document as filed in the court's Case Management/Electronic Case Filing (CM/ECF) system.

damage to the property caused by exposure of the property to harmful and deleterious conditions." (Id. ¶ 392). Along with other developer defendants, not including Hammonds, the contractors involved in the conversion from 2005 to 2007 "attempted to make various and sundry repairs to the units" in an attempt to "conceal, fabricate, patch, hide, and/or cloak . . . deficiencies and damage known, both actually and constructive[ly]" to them. (Id. ¶417).

The Concord West plaintiffs alleged that "latent building defects have, unbeknownst to [Concord West] Plaintiffs, regularly resulted in water intrusion into the buildings and property damage and continue to do so through the date of this filing." (Id. ¶ 421). They further alleged that the "latent building defects and property damage have regularly resulted in the deterioration of the buildings [and] attendant consequential damages[,] and continue to do so through the date of this filing." (Id. ¶ 422). The Concord West plaintiffs sought damages against all defendants for negligence, including, as applicable to Hammonds, for constructing units with inadequate flashings, roofs, and water barriers. (Id. ¶ 435c., d., e.).

The Concord West plaintiffs produced during discovery in the underlying lawsuit an expert witness "roof survey report," dated December 14, 2009, providing a "general assessment of the roof coverings and appurtenances in the complex." (DE 113-9, pp. 6, 10). The report noted that "[t]he roofs were built with a combination of hip and gable configuration," and "the roof assembly consists of asphalt composition shingles, roofing felt, and oriented strand board . . . roof sheathing supported by manufactured metal plate connected wood trusses." (DE 113-9, p.10). The report stated that "[t]he subject roofs exhibited numerous construction deficiencies and code violations that have resulted in water intrusion and damage." (Id. p. 11). The report stated that "[a] list of owner-reported leaks was provided by the management company of the complex," and that "[m]any of the

reported leaks were the direct result of one or more of the following issues." (Id.). The report then set forth "[c]himney chase issues," "[f]lashing issues," and "[r]oof shingle issues," (id. pp. 11-15), further details of which will be discussed in the analysis below.

The claims against Hammonds in the Concord West lawsuit settled in September 2011, without reaching trial. Prior to settlement, Hartford, Assurance, and Harleysville each agreed to participate in defense of the litigation, and each paid one-third of a $1 million settlement on behalf of Hammonds, subject to a reservation of rights to seek judicial reallocation. (DE 113-10, pp. 3-4; DE 118-4, p.9; DE 118-7, pp. 6-7; DE 135-1, p.3). First Financial initially agreed to contribute to the defense, but ultimately withdrew from the defense. (DE 127, p.4; DE 113-10, p.3). First Mercury did not participate in the defense, despite having been put on notice of the claims. (DE 112-5, p. 7; DE 113-10, p. 3). Harleysville paid $179,727.62 in defense costs on behalf of Hammonds. (DE 113-10, p.3). Assurance paid $125,257.39 in defense costs on behalf of Hammonds. (DE 135-1, p. 3).

According to interrogatory responses in the present litigation, Hammonds completed its roofing installation work on the Concord West project in May, 2001. (DE 118-4, p. 6; DE 113-8, p. 3 DE 118-5, p. 4). Certificates of occupancy were issued for all buildings in the Concord West project on or before October 26, 2001. (DE 118-5, p. 10; DE 113-8, p.3; DE 113-2, p.3).

B.    Southampton Pointe

In 2009, Hammonds was named as a defendant, among other contractors who had performed work on the Southampton Pointe project, in two lawsuits filed in state court in South Carolina, Southampton Pointe Property Owners Assoc., Inc. v. G.R. Hammonds, Inc., et al., No. 2009-CP-10-5830, and Joshua Shaap, et al. v. G.R. Hammonds, Inc., et al., No. 2009-CP-10-2978. The plaintiffs

9

in the underlying lawsuits (hereinafter the "Southampton Pointe plaintiffs") alleged in amended complaints filed in 2010 that the original buildings at Southampton Pointe, located in Mount Pleasant, South Carolina, were constructed in 1998 and 1999. (DE 34-14 ¶27; DE 34-15 ¶¶7, 29). Southampton Pointe originally consisted of 15 residential buildings and 240 apartments, and it was converted in 2005 to condominiums by a developer who performed repairs and modifications at that time. (DE 34-14 ¶¶ 2, 4; 34-15 ¶¶4, 29).

The Southampton Pointe plaintiffs alleged that defendants, including multiple other contractors and development companies in addition to Hammonds, "undertook the original design, construction and development of Southampton Pointe." (DE 34-14 ¶30; DE 34-15 ¶45). They alleged that all of the defendants collectively, "undertook and were under a duty to design, construct, maintain, repair, and sell the buildings and units that should have been constructed an/or repaired in accordance with the building code, construction industry standards and practices and in accordance with all requirements imposed by the laws and statutes of the State of South Carolina." (DE 34-14 ¶31; DE 34-15 ¶46). They alleged specifically that Hammonds "installed the roof and related flashings on the buildings at Southampton Pointe." (DE 34-14 ¶14; DE 34-15 ¶15).

The Southampton Pointe plaintiffs alleged that Hammonds was negligent in multiple respects, including, "[i]n failing to use due care in the construction, repair, and in installing the roofs and roofing accessories and flashings on the subject buildings." (DE 34-14 ¶36; DE 34-15 ¶52). As a result of such negligence, the Southampton Pointe plaintiffs claimed that they suffered damage "in that water and moisture have repeatedly and/or continuously intruded and continues to intrude into the building and units at issue causing damage and deterioration to the finish and structural elements of the buildings and units at issue." (DE 34-14 ¶ 48; DE 34-15 ¶64). They also claimed the same

damages resulting from breach of warranties and unfair trade practices against all defendants in the Southampton Pointe lawsuits. (DE 34-14 ¶¶ 56, 68; DE 34-15 ¶¶ 72, 84).

On April 26, 2010, an expert for the Southampton Pointe plaintiffs prepared a "roofing installation deficiencies investigation" report to document "construction deficiencies observed in the roof covering," as well as "improper installation and subsequent damage" to chimney chases. (DE 118-1, p. 4). The report stated that "[e]vidence of improper roof covering installation was observed on each of the buildings in the shingle installations in violation of the Code and typical manufacturer's installation requirements." (Id., p. 5). The expert report noted that several observed types of installation defects "will negatively affect the performance of the roof covering in a design wind event." (Id., pp. 5, 11, 13, 15). The report noted several other installation defects "promote[] water intrusion." (Id., pp. 17, 27, 29).

The claims against Hammonds in the Southampton Pointe lawsuit settled without reaching trial. Hammonds was represented in the lawsuit by Hartford, First Mercury, and Assurance, but not Harleysville or First Financial, who had also been notified of the lawsuit. (DE 120-1 p. 4; DE 135-1, p.4; DE 112-5, p.10; DE 113-6 p.8). Hartford paid $355,000, Assurance paid $130,000, and First Mercury paid $60,000, towards a total $545,000 settlement, with a reservation of rights to pursue other insurers for contribution. (DE 118-4, p.10; DE 135-1, p.4; DE 112-5, p.10). Assurance paid $108,559.18 in defense costs, and First Mercury paid $69,060.63 in defense costs, on behalf of Hammonds. (DE 135-1, p.4; DE 112-5, p.10).

According to discovery in the present litigation, Hammonds entered into a subcontract agreement in May 1998 to perform roofing and flashing work during the original construction of the Southampton Pointe project. (DE 118-4, p.7). Hammonds completed its roofing installation work

11

on the Southampton Pointe project in December 1999. (DE 118-4, p. 7; DE 118-5, p. 4). Certificates of occupancy were issued for all buildings in the Southampton Pointe project on or before December 31, 1999 (DE 118-5, p. 9).

C.     Vista Cove

In 2009 in state court in Florida, the Vista Cove Condominium Association commenced a lawsuit against Landsouth Construction, LLC ("Landsouth") and Vercon Construction, Inc., ("Vercon"), among several other contractors, captioned <u>Vista Cove Condominium Association, Inc. v. Atrium Windows and Doors, Inc.</u>, No. CA-09-0001 (hereinafter the "2009 original complaint") (DE 34-16, p. 22). The 2009 original complaint alleged construction defects in relation to Vista Cove, a multi-family condominium project consisting of 300 residential units, located in St. Augustine Beach, Florida, and it noted that a number of as-then "unknown . . . subcontractors" also worked on the project. (DE 34-16, pp. 24, 26).

In October 2009, Landsouth filed a third-party complaint against Hammonds (the "Landsouth third-party complaint"), and, in April 2010, Vercon filed a third-party complaint (the "Vercon third-party complaint") in the same case against Hammonds, among other subcontractors who had performed work on the Vista Cove project. (<u>See</u> DE 34-16 to -17; 34-18 to -23).[4] The Vista Cove Condominium Association filed an amended complaint in 2011 (the "2011 amended complaint") that also named Hammonds, among other subcontractors, as defendants. (<u>See</u> DE 34-24 to -25).

The facts alleged in each of these complaints may be summarized as follows. According to the 2009 original complaint, Vista Cove was constructed in multiple phases commencing in about 1998 and completed in about 2005. (DE 34-16, pp. 25-26). The 2009 original complaint alleged

---

[4] The 2009 original complaint is included as an exhibit to the Landsouth and Vercon third-party complaints. To avoid confusion, citations are to page numbers provided in the docket, rather than paragraph numbering.

improper roofing work, throughout the Vista Cove project, by Vercon and Landsouth, as primary contractors for certain phases of construction performed by each. (DE 34-16, p. 26). The 2009 original complaint also noted that a number of as-then "unknown . . . subcontractors" also worked on the project. (DE 34-16, pp. 24, 26). It alleged that "[o]ne or more of the [unknown subcontractors] performed work at Vista Cove relating to one or more of the construction defects described below," and noted "[p]laintiff will amend this Complaint to name the [unknown subcontractors], after they can be identified through discovery." (DE 34-16, p. 32). The 2009 original complaint alleged certificates of occupancy for buildings constructed by Vercon were issued between 1998 and April 2003, and those for Landsouth were issued between October 2004 and December 2004. (DE 34-16, p. 28).

With respect to defects in roofing work, the 2009 original complaint alleged that "[s]hingles in roof valleys of Vercon Buildings were installed without being laced correctly;" "[f]lashing in roof valleys of Vercon Buildings was not properly installed or secured with cement;" "[r]idge vents in the Vercon Buildings were not fastened correctly or otherwise incorrectly installed;" and "[r]oofing cement was not properly used to seal against water intrusion in required areas such as ears of flashing corners, lead boots and goose neck vents." (DE 34-16 pp. 35-36).

On the basis of such defects, the 2009 original complaint asserted claims of negligence, violations of building codes, and breach of warranty. With respect to damage, the 2009 original complaint alleged "[a]s a direct consequence of the violations, water is leaking into some Buildings exposing the interior its [sic] and its occupants to moisture damage and to mold and mildew." (DE 34-16, p. 36). In addition, "[a]s a direct consequence of the violations, the Buildings have excessive moisture making it impossible to assure effective termite protection." (DE 34-16, p. 36).

As alleged in the Vercon third-party complaint Vercon performed work on "Phases I-IV" of the Vista Cove project, and, in 2002, at the end of "Phase IV" construction, Vercon became insolvent and ceased doing work on the Vista Cove project. (DE 34-18 pp. 5-6). Vercon entered into a subcontract with Hammonds to perform "complete installation of roofing" for Phases III and IV. (DE 34-18, pp. 7-8; DE 34-23, pp. 22-23). According to the Vercon third-party complaint, the allegations regarding defective construction work in the 2009 original complaint "implicate[] the third-party defendant subcontractors' [including Hammonds'] scopes of work." (DE 34-18 p.6). Specifically, the "work performed by [Hammonds] was defective as the roof contained certain defects," and Hammonds "defectively installed the roofs," as alleged in the 2009 original complaint (DE 34-18 p. 15).

As alleged in the Landsouth third-party complaint, Hammonds entered into a subcontract with Landsouth in February 2004, for "the complete installation of roofing" for "Phase V" of the Vista Cove project, comprising ten residential buildings and several non-residential buildings. (DE 34-16 pp. 5-6; DE 34-17 pp.14 & 21). With respect to Phase V, "the work performed by Hammonds was defective in the Hammonds' work contained certain defects in the construction of the roofing system," as alleged in the 2009 original complaint (DE 34-16 p.11).

The 2011 amended complaint alleged dates of roofing construction generally consistent with the 2009 original complaint allegations. Specifically, Phase III roofing work commenced in 1999, Phase IV roofing work commenced in May 2001. (DE 34-18 ¶¶25-26). Phase III buildings were substantially completed and a certificate of occupancy was issued in April 2001. (DE 34-24 ¶74). Phase IV buildings were substantially completed and a certificate of occupancy was issued in April

14

2003. (DE 34-24 ¶77). The buildings in Phase V were substantially completed and a certificate of occupancy was issued in December 2004. (DE 34-24 ¶77).

Consistent with the original complaint and third-party complaints, the 2011 amended complaint alleged that Hammonds contracted for the construction and installation of "[r]oofing and flashing or roof penetrations" and other roofing work for Phases III, IV, and V of the Vista Cove project. (DE 34-24 ¶¶ 98, 100, 105). It alleged that Hammonds breached building codes in multiple respects, including, "shingles in roof valleys were installed without being laced correctly," "flashing in roof valleys was not properly installed or secured with cement," and "[r]oofing cement was not properly used to seal against water intrusion in required areas." (DE 34-24 ¶109). As a result of such violations, the amended complaint claimed damages in that "water is leaking into some Buildings exposing the interior its [sic] and its occupants to moisture damage and to mold and mildew." (DE 34-24 ¶112). The 2011 amended complaint also alleged that as a result of such violations, their "personal property" and "their betterments have been damaged by moisture intrusion." (DE 34-24 ¶118). On the basis of such defective work and damages, the 2011 amended complaint claimed negligence and breach of warranties against Hammond. (DE 34-25 ¶¶150, 156). A 2008 "building inspection" report attached to the Vercon third-party complaint states that it was prepared by the Vista Cove Condominium Association "to determine if structural problems exist as a result of moisture intrusion in the buildings." (DE 34-20, p. 29). The report states that "[t]he conditions found in these buildings indicate serious water intrusion and resultant structural damage." (DE 34-21, p.1). A further report attached to the Vercon third-party complaint, dated January 15, 2010, further details damages, defects, and repairs, resulting from alleged violations, including "[s]tructural damage to wood studs and sheathing," "mold damage to walls." (DE 34-20, p. 13).

According to the report, due to roofing defects, "water is directed toward the exterior walls with no way to prevent water from entering through the stucco into the wall cavity." (Id., p. 14).

All claims against Hammonds in the Vista Cove lawsuit settled without reaching trial. Hammonds was represented in the lawsuit by Harleysville, First Financial, and Assurance (DE 113-10, p.5). Harleysville paid $105,000, Assurance paid $32,500, and First Financial paid $72,500, towards settlement, with a reservation of rights to pursue other insurers for contribution. (DE 113-10, p.5). Harleysville incurred $252,057.54 in defense costs, and Assurance incurred $1,477.00 in defense costs, on behalf of Hammonds. (DE 113-10, p.5). First Mercury did not provide a defense or pay towards settlement, despite having been notified of the underlying Vista Cove lawsuit. (DE 112-5, p. 8).

According to discovery in the present litigation, Hammonds performed work on Phase III of the Vista Cove project from June 2000 to June 2001; on Phase IV from October 2001 to April 2003; and on Phase V from February 2004 to October 2004. (DE 118-4, p. 8; DE 118-5, p. 4; DE 118-3 p.3). Certificates of occupancy were issued for all buildings in the Vista Cove project on which Hammonds completed work on or before December 29, 2004. (DE 118-5, pp. 12-13).

## DISCUSSION

A.     Standard of Review

1.     Declaratory Judgment

Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he Declaratory Judgment Act [is] an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." Wilton v. Seven Falls Co.,

515 U.S. 277, 287 (1995) (quotations omitted). Exercise of this discretion "is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." <u>United Capitol Ins. Co. v. Kapiloff</u>, 155 F.3d 488, 493-94 (4th Cir.1998) (quotations omitted).

    2.    Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." <u>Id.</u> at 255. Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." <u>Lovelace v. Sherwin-Williams Co.</u>,

17

681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).

Where, as here, a court faces cross-motions for summary judgment, it must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir.2003).

B.   Analysis

1.   Principles of Insurance Policy Interpretation

General principles governing interpretation of terms in an insurance policy, under North Carolina law,[5] are well established:

> As with all contracts, the goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299-300 (2000) (quotations omitted).

---

[5] North Carolina law governs the parties' dispute, where the pertinent insurance policies were issued and delivered to Hammonds in North Carolina. See Fortune Ins. Co. v. Owens, 351 N.C. 424, 428 (2000).

18

The scope of coverage under an insurance policy may encompass both a "duty to defend" and a "duty to indemnify." Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C., 364 N.C. 1, 7 (2010). "In determining whether an insurer has a duty to defend, the facts as alleged in the [underlying] complaint are to be taken as true and compared to the language of the insurance policy." Id. "If the insurance policy provides coverage for the facts as alleged, then the insurer has a duty to defend." Id. In addition, "where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage." Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 691 (1986). Rather, "pleadings that disclose a mere possibility that the insured is liable (and that the potential liability is covered) suffice to impose a duty to defend upon the insurer." Id. at 691 n.2. Only "if the facts are not even arguably covered by the policy, then the insurer has no duty to defend." Id. at 692.

"Conversely, in determining whether an insurer has a duty to indemnify, the facts as determined at trial [in the underlying case] are compared to the language of the insurance policy." Buzz Off, 364 N.C. at 7. "If the insurance policy provides coverage for the facts as found by the trier of fact, then the insurer has a duty to indemnify." Id. However, where the underlying litigation settles prior to reaching trial, as here, "[a] judicial assessment of post-settlement coverage disputes generally turns on the types of the underlying claims that have been settled." ABT Building Products Corp. v. National Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 120 n. 29 (4th Cir. 2006) (applying North Carolina law). Where appropriate, facts pertinent to the determination of indemnification obligations may be determined on the basis of the record presented upon summary judgment motions, as here. See, e.g., Gaston, 351 N.C. at 297 (affirming trial court determination,

19

upon hearing summary judgment motions, that there were no issues of material fact and allocating

indemnity obligation as a matter of law, for underlying action resolved by settlement agreement

prior to trial).

In addition, "[u]nder North Carolina law, if an insurer improperly refuses to defend a claim,

it is estopped from denying coverage and must pay any reasonable settlement – even if it made an

honest mistake in its denial." In re Abrams & Abrams, P.A., 605 F.3d 238, 241 (4th Cir. 2010); see

Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 277 N.C. 216, 219 (1970) ("It is well settled

that an insurer who wrongfully refuses to defend a suit against its insured is liable to the insured for

sums expended in payment or settlement of the claim, for reasonable attorneys' fees, [or] for other

expenses of defending the suit.").  By contrast, the insurer will not be so estopped "if it defends

under a full reservation of its right to deny coverage, or if it gives timely notice to its insured of

reservation of its right to assert the defense of noncoverage." Nationwide Mut. Ins. Co. v. Aetna

Cas. & Sur. Co., 1 N.C. App. 9, 13-14 (1968) (citing Shearin v. Globe Indemnity Company, 267

N.C. 505 (1966); Jamestown, 266 N.C. at 435).

2.      Cases Determining Trigger of Coverage for Identical Insurance Policy Provisions

Many North Carolina cases have interpreted general commercial liability policy terms and

provisions identical to those at issue in the present case.  Five cases discussed below, which arise

in contexts with varying degrees of similarity to the facts of the underlying lawsuits here, provide

useful background for the court's determination of trigger of coverage in the present case.

In Gaston County Dyeing Machine, Co. v. Northfield Insurance Co., 351 N.C. 293 (2000),

the plaintiff, a manufacturing company ("Gaston"), brought a declaratory judgment action to

determine coverage under its insurance policies with three separate insurers, arising out of an

underlying products liability lawsuit brought by a pharmaceutical company against Gaston. As pertinent here, in the underlying lawsuit, the pharmaceutical company alleged Gaston defectively designed and manufactured a pressure vessel that was used in production of contrast media dyes by the pharmaceutical company for diagnostic medical imaging. The pharmaceutical company alleged that, on June 21, 1992, it increased the operating pressure in the vessel, and chemicals used in connection with the production process began leaking into the vessel. Ultimately, the leaking chemicals contaminated over 60 tons of contrast media dye produced over a period of time until the leak was discovered on August 31, 1992.

The period of leaking chemicals spanned two different insurance policy periods, the first in effect from July 1991 to July 1992, and the second in effect from July 1992 to July 1993. As pertinent here, one of the three insurers provided a defense to Gaston in the underlying lawsuit, which was resolved ultimately by a settlement payment to which each of the three insurers contributed a portion (in addition to a portion paid by a fourth insurance company for a separate defendant), reserving the right to seek reallocation of the settlement. Upon motions for summary judgment filed in the declaratory judgment action, the trial court determined that there were no material issues of fact, and that the "occurrence" of "property damage" took place on June 21, 1992, when the pressure vessel ruptured and the leak first started, rather than August, 1992, when the leak was discovered or any time in between, where the date of the rupture was "established without question or uncertainty." Gaston, 351 N.C. at 297 & 300.

In affirming this trial court determination, the Supreme Court noted that there was "no dispute that the contamination of [the pharmaceutical company's] contrast media dye commenced" on June 21, 1992, "as a result of the rupture of the pressure vessel and subsequent leakage, and

continued to discovery on August 31, 1992." Id. at 302. Examining policy language identical to that at issue here, the court held that there was thus one "occurrence" that took place on June 21, 1992, "when the leak commenced," thus triggering coverage only under the policy period July 1991 to July 1992:

> The sudden, unexpected leakage from the pressure vessel, causing release of a contaminant into Sterling's dye product, certainly comes within the ordinary meaning of the term "accident." Further, there is no dispute that all the damage occurred as a result of exposure to the same harmful condition – continued leakage of the contaminant into the dye product. Thus, under the plain language of the insurance policies, the property damage was caused by an occurrence, and property damage occurred on 21 June 1992 when the pressure vessel ruptured. Stated differently, the "injury-in-fact" in this case can be determined with certainty because the cause of the property damage occurred and property damage resulted on 21 June 1992. Therefore, the 1 July 1991 to 1 July 1992 policy period is triggered, even though the contamination continued until discovery of the leak on 31 August 1992 . . . . We conclude that where the date of the injury-in-fact can be known with certainty, the insurance policy or policies on the risk on that date are triggered.

Id. at 302-03 (emphasis added).

Following Gaston, several North Carolina Court of Appeals opinions interpreted Gaston in the context of construction defects insurance litigation, with varying results. In Hutchinson v. Nationwide Mutual Fire Ins. Co., 163 N.C. App. 601 (2004), the court addressed the date of trigger of coverage following an arbitration award in favor of two homeowners against a contractor that had constructed a new home with a retaining wall. According to the court's summary in the opinion, the retaining wall allegedly "was damaged due to [the contractor's] negligence" and failure to adhere to acceptable standards of construction. Hutchinson, 163 N.C. App. at 602. The "[p]roperty damage" alleged in the case "was allegedly caused by either (1) [the contractor's] failure to install a drainage system in the retaining wall and/or to use proper soil under the retaining wall or (2) the continual entry of water into the soil from the compacted surface area." Id. at 604.

22

After damages were assessed against the contractor in the arbitration, the homeowners brought an action against the contractor's insurance company to recover the damages assessed. While the wall was constructed during the summer of 1999, the insurance company insured the contractor only for the period after November 15, 1999. On appeal, the court held that the insurance policy was not triggered because the damage to the wall under either theory "was caused by faulty construction pre-dating insurance coverage." Id. at 605. In support of its decision, the court cited only one case, Gaston, reasoning that Gaston "held that even in situations where damage continues over time, if the court can determine when the defect occurred from which all subsequent damages flow, the court must use the date of the defect and trigger the coverage applicable on that date." Id. (citing Gaston, 351 N.C. at 303-04) (emphasis added).

After Hutchinson, the North Carolina Court of Appeals in two cases followed similar reasoning in determining the date of trigger of insurance coverage in the context of allegedly negligent construction. In Harleysville Mutual Ins. Co. v. Berkley Ins. Co., 169 N.C. App. 556 (2005), the court held that there was no coverage for damages caused by defective construction of stucco siding, under an insurance policy in effect after construction and repairs of stucco siding had completed. The court identified evidence of "water intrusion" and "a latent defect associated with the manner in which the property was constructed," and concluded in light of the evidence "it is clear that the [homeowner's] property damage was caused by [the contractor's] actions or inactions prior to the effective date of its policy." Harleysville, 169 N.C. App. at 562. Relying solely on Gaston and Hutchinson's interpretation thereof, the court applied the rule that "if the court can determine when the defect occurred from which all subsequent damages flow, the court must use

23

the date of the <u>defect</u> and trigger the coverage applicable on that date." <u>Id.</u> at 560 (quoting

<u>Hutchinson</u>, 163 N.C. App. at 605) (emphasis added).

Similarly, relying solely on <u>Gaston</u>, <u>Hutchinson</u>, and <u>Harleysville</u>, the Court of Appeals in

<u>Nelson v. Hartford Underwriters Ins. Co.</u>, 177 N.C. App. 595 (2006), held that there was no

coverage for mold caused by defective air conditioning installation and leaks in plumbing, all of

which undisputably were completed and were discovered prior to start of coverage period in an

insurance policy. The court held "even though the mold damage continued over time, we can

determine when the <u>defects</u> occurred from which all subsequent damages flowed, and we must use

the dates of these <u>defects</u> and trigger the coverage applicable on that date." <u>Nelson</u>, 177 N.C. App.

at 607 (citing <u>Hutchinson</u>, 163 N.C. App. at 605 (emphasis added).

More recently, the North Carolina Court of Appeals has called into question <u>Hutchinson's</u>

use of "the date of the defect" as the trigger of insurance coverage in the context of faulty

construction insurance coverage disputes. In <u>Erie Ins. Exchange v. Builders Mutual Ins. Co.</u>, 742

S.E.2d 803 (2013), the court observed:

> to the extent <u>Hutchinson</u> uses the term "defect" in summarizing our Supreme Court's
> holding in <u>Gaston County Dyeing</u>, such language mischaracterizes the holding in
> <u>Gaston County Dyeing</u>, as our Supreme Court did not use the term "defect," but
> rather, "injury-in-fact." In <u>Gaston County Dyeing</u>, our Supreme Court held that
> "where the date of the *injury-in-fact* can be known with certainty, the insurance
> policy or policies on the risk on that date are triggered." <u>Gaston County Dyeing</u>, 351
> N.C. at 303, 524 S.E.2d at 564 (emphasis added). Notably, in <u>Gaston County Dyeing</u>,
> had our Supreme Court looked to the date the "defect" occurred in the underlying
> action, i.e., when the faulty pressure vessel was fabricated by Gaston, the holding
> would have been markedly different. However, in <u>Gaston County Dyeing</u>, our
> Supreme Court looked to when the defective product failed and caused the property
> damage complained of, consistent with the terms of the insurance policy at issue. <u>Id.</u>
> at 302, 524 S.E.2d at 564. To the extent the language employed in <u>Hutchinson</u> is
> inconsistent with that employed by our Supreme Court in <u>Gaston County Dyeing</u>, we
> follow our Supreme Court's holding and analysis.

Erie Ins. v. Builders Mutual Ins. Co., 742 S.E.2d at 812. In Erie, the court addressed the proper trigger of coverage date for damages to a residence that occurred when a slope and retaining wall collapsed. The court held that the "occurrence" for purposes of coverage was not the date of construction of the wall, but rather the date of the wall's collapse, even though "the faulty construction ultimately caused the slope collapse that resulted in the property damage." Erie, 742 S.E.2d at 813.

With this case background in mind, the court turns to application of the policy language in question to the instant coverage dispute.

3.      Application to the Instant Coverage Dispute

As noted above, coverage under the policies in dispute in this case may take the form of a duty to defend and a duty to indemnify. Where some of the parties defended in the underlying lawsuits under a reservation of rights, and where other parties did not provide any defense, the court will address first the issue of duty to defend, because it is determinative also of the duty to indemnify for those insurers who did not provide a defense. See In re Abrams & Abrams, 605 F.3d at 241. In addition, as set forth below, the analysis of trigger of coverage for the duty to defend overlaps substantially with the duty to indemnify under the circumstances of this case, providing a useful framework for determining allocation of both defense costs and settlement payments made.[6]

---

[6]  Accordingly, because the issue of duty to defend is part of the "coverage" determination under the insurance companies' policies,  Abrams, 605 F.3d at 241, and because the trigger of coverage for the duty to defend overlaps substantially with the duty to indemnify under the circumstances of this case, the court rejects Hartford's suggestion in its brief that the court should limit its determination in this case solely to a declaration as to the parties' respective indemnification obligations.

a. Duty to defend

i. Trigger of coverage

Under the insurance policies at issue in this case, coverage is triggered by "property damage" which "occurs during the policy period" and which "is caused by an 'occurrence.'" (e.g., DE 34-3, pp. 14). "Property damage" is defined as "physical injury to tangible property," and an "occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same harmful conditions." (e.g., DE 34-3, pp. 27-28).

The property damage alleged in each of the three underlying lawsuits was of the same nature. In each case, the alleged form of the physical injury to tangible property – the necessary focus of the inquiry under the policies – was injury to interior structures, finishes, and other portions of buildings from water intrusion. In particular:

1. The Concord West plaintiffs alleged "water intrusion into the buildings . . . through the date of [lawsuit]" and "deterioration of the buildings [and] attendant consequential damages[,] . . . through the date of [lawsuit." (DE 34-12 ¶¶ 421, 422).

2. The Southampton Pointe plaintiffs alleged "water and moisture have repeatedly and/or continuously intruded and continues to intrude into the building and units at issue causing damage and deterioration to the finish and structural elements of the buildings and units at issue." (DE 34-14 ¶ 48; DE 34-15 ¶64).

3. The Vista Cover plaintiffs alleged "water is leaking into some Buildings exposing the interior its [sic] and its occupants to moisture damage and to mold and mildew," and their "personal property" and "their betterments have been damaged by moisture intrusion." (DE 34-24 ¶¶ 112, 118).

Based on these allegations, the "occurrence" or "accident" that triggers the insurance policies is either intrusion of water into the interior of the buildings or the contact of such water with interior portions of the buildings, which harmful condition caused damages to such building structures through the date of the lawsuits. None of the plaintiffs alleged, however, when the water intrusion

26

started, nor when interior portions of buildings first became exposed to such water intrusion, nor when "deterioration to the finish and structural elements" first started as a result of contact with water. (e.g., DE 34-14 ¶ 48; DE 34-15 ¶64).

Accordingly, it is reasonable to infer from the allegations in the underlying complaints that water intrusion could have begun in various buildings at various different times, all the way up to the time of the lawsuits. It may have begun in one or all buildings during the first rainfall after construction completed, or it may not have begun until some later point, such as upon the first freeze or first hurricane. In other words, the start date of the "physical injury to tangible property," and in turn the "occurrence" or "accident," as alleged in the underlying lawsuits, is inherently uncertain. If anything is certain based on the allegations in the complaints, it is that the "occurrence" or "accident" did not take place at the very moment the faulty construction was completed, but rather at some unspecified and unknowable time between that completion date and the date of the lawsuits.

In light of these alleged circumstances, there is no basis in the language of the policies to adopt the suggestion of Harleysville, Assurance, First Financial, and First Mercury, to use the date construction completed as the trigger of coverage. Nor is there any basis under North Carolina law so to do. Indeed, Gaston forecloses such an approach. Gaston looked to the "date of the injury-in-fact" as opposed to the date of the defect in the installed product to determine the trigger of coverage under the same commercial general liability policy language. See Gaston, 351 N.C. at 303. As recognized by Erie, "had our Supreme Court looked to the date the 'defect' occurred in the underlying action, i.e., when the faulty pressure vessel was fabricated by Gaston, the holding would have been markedly different." Erie, 742 S.E.2d at 812 (emphasis added). "However, in [Gaston],

our Supreme Court looked to when the defective product failed and caused the property damage complained of, consistent with the terms of the insurance policy at issue." Id.

In light of Gaston, the language in Hutchinson suggesting use of a "date of the defect" as a trigger of coverage, is not correct. Rather, the court must consider the date of the "injury-in-fact." Gaston, 351 N.C. at 303. "To the extent the language employed in Hutchinson is inconsistent with that employed by [the] Supreme Court in [Gaston], we follow [the] Supreme Court's holding and analysis." Erie, 742 S.E.2d at 812. Because of this flaw in reasoning in Hutchinson, the holdings in Hutchinson, Harleysville, and Nelson, relying on it, are equally flawed.

"Generally, only if the decision of a state's intermediate court cannot be reconciled with state statutes, or decisions of the state's highest court, or both, may a federal court sitting in diversity refuse to follow it." Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1003 (4th Cir. 1998). "[P]ersuasive data that the state's highest court would not follow the intermediate court's decision" include "the holdings of a state's highest court that undermine the rationale of an intermediate appellate court decision." Id. "[T]his is so even if a state supreme court holding antedates the inferior court's opinion." Id. Here, because the North Carolina Supreme Court's holding in Gaston undermines the reasoning of Hutchinson, as well as Harleysville, and Nelson, which rely upon that same reasoning as a basis for decision,[7] the court declines to follow these intermediate appellate court decisions.

---

[7] See Nelson, 177 N.C. App. at 607 ("[E]ven though the mold damage continued over time, we can determine when the defects occurred from which all subsequent damages flowed, and we must use the dates of these defects and trigger the coverage applicable on that date.") (emphasis added) (citing Hutchinson, 163 N.C. App. at 605); Harleysville, 169 N.C. App. at 560 ("[E]ven in situations where damage continues over time, if the court can determine when the defect occurred from which all subsequent damage flows, the court must use the date of the defect and trigger the coverage applicable on that date.") (emphasis added) (quoting Hutchinson, 163 N.C. App. at 605).

Hutchinson, Harleysville, and Nelson, are further undermined by the North Carolina Supreme Court's determination of the meaning of "accident" as used in commercial general liability policies such as those at issue in this case. The Supreme Court of North Carolina has defined "accident" in the context of such policies as "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it." Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 694 (1986) (quotations omitted). "Whether events are 'accidental' and constitute an 'occurrence' depends upon whether they were expected or intended from the point of view of the insured." Id. As such, the court has held that an "accident" may "include injury resulting from an intentional act, if the injury is not intentional or substantially certain to be the result of the intentional act." N. Carolina Farm Bureau Mut. Ins. Co. v. Stox, 330 N.C. 697, 709 (1992) (emphasis added). Gaston also confirms that it is not the faulty fabrication of an item that constitutes an "accident," but rather the rupture, deterioration, or failure, of the item, which is "unplanned and unforseen," that constitutes the "accident" and "occurrence" covered under the general commercial liability policy. Gaston, 351 N.C. at 302.

The reasoning in Hutchinson, Harleysville, and Nelson, is in conflict with Gaston and Stox, because Hutchinson concluded that the injury triggering coverage in that case was "faulty construction pre-dating insurance coverage," and the contractor's "actions and inactions at the time the retaining wall was constructed." 163 N.C. App. at 605; see Harleysville, 169 N.C. App. at 563 (holding that injury triggering coverage was improper installation of stucco siding); Nelson, 177 N.C. App. at 607 (holding that injury triggering coverage included improper installation of HVAC system). Considering the definition of "accident" as stated in Gaston and Stox, however, the injury

in these cases thus should not have been considered the intentional act of construction or installation, but rather the resulting deterioration of the walls and interior structures.

Hutchinson, Harleysville, and Nelson also are in conflict with the recognition under North Carolina law that "'property damage' in the context of commercial general liability policies means 'damage to property that was previously undamaged' and does not include 'the expense of repairing property or completing a project that was not done correctly or according to contract in the first instance' by the insured." Breezewood of Wilmington Condominiums Homeowners' Ass'n, Inc. v. Amerisure Mut. Ins. Co., 335 F. App'x 268, 271 (4th Cir. 2009) (quoting Prod. Sys., Inc v. Amerisure Ins. Co., 167 N.C. App. 601, 606 (2004)). "The rationale underlying this view is that the quality of the insured's work is a business risk which is solely within his own control, and that liability insurance generally does not provide coverage for claims arising out of the failure of the insured's product or work to meet the quality or specifications for which the insured may be liable as a matter of contract." Id. (quotations omitted).

In this manner, in Travelers Indem. Co. v. Miller Bldg. Corp, 97 Fed. App'x 431 (4th Cir 2004), the Fourth Circuit held under North Carolina law that "faulty workmanship" in constructing hotel windows and doors does not constitute "property damage," whereas "later-occurring water damage to the guest room carpet" resulting from such faulty workmanship does. Id. at 434 (emphasis added). Accordingly, the faulty construction in each of the cases, Hutchinson, Harleysville, and Nelson, should not have been treated by the court as the "property damage" triggering coverage. Rather, coverage should have been triggered only on the basis of the timing of injury to other

30

property, such as the unintended intrusion of water to structural elements or interior building elements.[8]

In sum, the language of the policies in the instant matter and North Carolina law does not support using the date of completion of defective construction as the trigger date for coverage under the policies.

Having determined that the date construction completed is not the proper trigger of coverage, the question remains what approach instead should be used. Given that the start date of the "occurrence" or "accident" in the underlying lawsuits is inherently uncertain, and could have taken place at any time between the date construction was completed on any building and the date of the lawsuits, it is reasonable to find that coverage is triggered under all policies in effect during that time period.

Although the North Carolina Supreme Court has not addressed trigger of coverage where the date of injury is inherently uncertain, as here, Gaston points the way to the proper approach. There, as noted previously, the court adopted the "injury-in-fact" date as the trigger of coverage, where date of the "injury-in-fact" in that case, the rupture of a pressure vessel, could "be determined with certainty." Gaston, 351 N.C. at 302. The court considered, but rejected under those circumstances, two alternative approaches to trigger of coverage. First, the court rejected a trigger of coverage

---

[8] The court need not follow Hutchinson, additionally, because it is impossible to determine from the opinion whether the court's holding is "directly on point." Assicurazioni, 160 F.3d at 1003. In particular, the opinion lacks a statement of facts that would enable meaningful comparison to the present case. The opinion at one point references "damages they [the plaintiffs] incurred as a result of [the contractor's] faulty construction of their retaining wall," implying that there was some injury beyond the wall itself that was constructed.163 N.C. App. at 602 (emphasis added). At another point in the analysis, however, the opinion references an allegation of "significant damage to the retaining wall," due to "continual entry of water into the soil under the retaining wall" implying that the only injury was to the wall itself. Id. at 604. But there is no statement anywhere in the opinion describing what form of injury to property resulted. Such information, under the "injury-in-fact" analysis set forth in Gaston, is essential to meaningful comparison of the holding in Hutchinson to the present case.

based upon "time of manifestation or on the date of discovery," as this was contrary to its determination that the "time of the injury-in-fact" controls. Id. at 303.

Second, the court rejected a trigger of coverage based upon a "'continuous' or 'multiple trigger' theory." Id. The circumstances in Gaston providing the reason for rejecting such theory, however, are not present in the instant case. Indeed, the opposite circumstances are present here. Specifically, the court in Gaston observed:

> In this case, the rupture of the pressure vessel caused all of the ensuing property damage, even though the damage continued over time, contaminating multiple dye lots and extending over two policy periods. Therefore, when, as in this case, the accident that causes an injury-in-fact occurs on a date certain and all subsequent damages flow from the single event, there is but a single occurrence; and only policies on the risk on the date of the injury-causing event are triggered.

Id. at 303-04 (emphasis added). The court emphasized the certainty of the date of injury multiple times in its opinion, noting "the date of property damage is known and undisputed," and "can be established without question or uncertainty." Id. at 288 & 299.

Applying the reasoning of Gaston to the contrasting circumstances of the present case leads to the conclusion the court has adopted here. When, as in this case, the alleged accidents that cause the injuries-in-fact occur on dates that are not certain, there are possible multiple occurrences. See id. at 304. Thus, all policies on the risk on the possible dates of those injury-causing events are triggered. See id. Such an approach remains consistent with Gaston because it still "look[s] to the cause of the property damage," e.g., the dates the roofs failed and water intruded, rather than the ultimate "effect" of such water intrusion, e.g., manifestation of rotten structural elements or mold. Gaston, 351 N.C. at 303, The key difference leading to a multiple trigger of coverage rather than single trigger of coverage, is that the dates of the injuries-in-fact are inherently uncertain and cannot be established as a single trigger of coverage.

In addition, unlike in <u>Gaston</u>, where a single vessel rupture caused all subsequent damages, the damages in the underlying cases here are alleged to have occurred in multiple different buildings. Thus, while in <u>Gaston</u> damages could be pinpointed to the exact date of a single rupture, no such single date is appropriate where water intrusion may have taken place in some buildings prior to others. Thus a multiple trigger theory of coverage is necessitated by the facts as alleged in the underlying lawsuits.

A multiple trigger approach is likewise consistent with North Carolina law imposing a duty on all insurers to share equally in defense of a lawsuit, where allegations in a complaint give rise to the possibility of multiple coverages. As discussed above, "allegations of facts that describe a hybrid of covered and excluded events or pleadings that disclose a mere possibility that the insured is liable (and that the potential liability is covered) suffice to impose a duty to defend upon the insurer." <u>Waste Mgmt.</u>, 315 N.C. at 691 n.2. Where this test for coverage as to duty to defend is met, "once it is shown that [an insurer] breached its duty to defend, the remedy for the breach is that it should <u>share equally</u> in the costs of defending [the insured]." <u>St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.</u>, 919 F.2d 235, 236 (4th Cir. 1990) (applying North Carolina law) (emphasis added); <u>see Ames v. Cont'l Cas. Co.</u>, 79 N.C. App. 530, 540 (1986) (holding that where two insurers both had a duty to defend, "equity dictates that the defense costs be shared equally among the two insurers"); <u>Med. Mut. Ins. Co. of NC v. Am. Cas. Co. of Reading, PA</u>, 721 F. Supp. 2d 447, 464 (E.D.N.C. 2010) (same, applying North Carolina law).

In sum, because it is inherently uncertain based on the allegations in the underlying lawsuits when property damage alleged in the underlying lawsuits commenced, a multiple trigger of coverage test applies. Each of the insurance companies in the present action had a duty to defend and share

33

equally in defense costs in the underlying lawsuits, where their policies were in effect within the time frame between the date any building allegedly first was completed through the date of the lawsuits. The court will set forth further below the calculation of equal shares of costs of defense in each of the three underlying lawsuits. Before doing so, however, the court will address the arguments of First Mercury and First Financial that an exclusion in their policies precludes coverage.

### ii. Exclusions

First Mercury and First Financial argue that an exclusion in their policies precludes coverage in the underlying lawsuits, except for Vista Cove with respect to First Financial.

"Once it has been determined that the insuring language embraces the particular claim or injury, the burden then shifts to the insurer to prove that a policy exclusion excepts the particular injury from coverage." Universal Ins. Co. v. Burton Farm Dev. Co., LLC, 216 N.C. App. 469, 473 (2011) (quotations omitted). "Exclusionary clauses are interpreted narrowly while coverage clauses are interpreted broadly to provide the greatest possible protection to the insured." Id. (citing State Capital Ins. Co. v. Nationwide Mut. Ins. Co., 318 N.C. 534, 542-43 (1986)).

As with the determination of coverage, "the pleadings are read side-by-side with the policy to determine whether the events as alleged are . . . excluded." Waste Mgmt., 315 N.C. at 693. "Where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage." Id. at 691. As noted previously, "pleadings that disclose a mere possibility that the insured is liable (and that the potential liability is covered) suffice to impose a duty to defend upon the insured." Id. at 691 n.2.

First Mercury relies upon the following exclusion:

> This insurance does not apply to any damages because of or related to bodily injury or property damage:
>
>     \*       \*       \*
>
> 3. which were caused, or are alleged to have been caused, by the same condition or construction defect which resulted in bodily injury or property damage which first existed prior to the inception date of this policy.

(e.g. DE 112-1, p.36). Under the allegations of each of the three underlying lawsuits, the property damage alleged does not necessarily fall under this exclusion. Specifically, as discussed above, in each case, the alleged property damage, or the physical injury to tangible property, was injury to interior structures and portions of buildings from water intrusion. (See DE 34-12 ¶¶ 421, 422 (Concord West); DE 34-14 ¶ 48; DE 34-15 ¶64 (Southampton Pointe); (DE 34-24 ¶¶ 112, 118) (Vista Cove)). None of the plaintiffs alleged, however, when water intrusion started or deterioration to finish and structural elements commenced.

Accordingly, because none of the plaintiffs in the underlying lawsuits alleged when water intrusion started, or when deterioration to all buildings had commenced, it is not reasonable to infer from such lawsuits that all alleged "property damage . . . first existed prior to the inception date of [the First Mercury] policy," on October 28, 2006. (DE 112-1, p.36). In other words, based on the allegations in the complaints, some property damage alleged could have begun after October 28, 2006. Therefore, the exclusion cited by First Mercury does not apply to bar coverage for the underlying lawsuits.

First Mercury argues that because the "construction defects" first existed well before the inception date of the First Mercury policies, then there can be no coverage under the language of the exclusion. "All that is necessary for the exclusion to apply," it argues "is for the construction defect from which the damage allegedly resulted to have existed prior to inception of the First Mercury

Policies." (Opp. at 17). But this is not what the exclusion states. This argument does not take into account the final clause of the exclusion. The exclusion is not just dependent upon the date of the "construction defect," but rather is dependent upon property damage caused "by the same condition or construction defect <u>which resulted in bodily injury or property damage which first existed prior to the inception date of this policy.</u>" (e.g. DE 112-1, p.36) (emphasis added). In other words, it is the "property damage," not the construction defect, which must have first existed prior to the inception date of the policy, for the exclusion to apply.[9] While the construction defect in each underlying suit existed prior to the exception of the First Mercury policy, there is no allegation that the "property damage" resulting therefrom necessarily existed prior to October 2006.

The First Financial exclusion is inapplicable in a similar respect. First Financial relies upon the following exclusion:

> This insurance does not apply to:
> 1. any loss or claim for damages arising out of or related to "property damage", whether known or unknown:
> a. which first occurred prior to the inception date of this policy; or
> b. which is, or is alleged to be, in the process of occurring as of the inception date of this policy.

(DE 126-1, p. 26). Because none of the plaintiffs in the underlying lawsuits alleged when water intrusion started, or when deterioration to all buildings had commenced, it is not reasonable to infer from such lawsuits that all alleged "property damage" necessarily first occurred prior to the inception date of the First Financial policy, on October 28, 2002. Accordingly, the First Financial exclusion is inapplicable.

---

[9] In any event, First Mercury has at best failed to overcome an ambiguity in its exclusion that must result in construing the exclusion in favor of the insured. <u>See</u> <u>Gaston</u>, 351 N.C. at 299-300. By using two back-to-back clauses beginning with the word "which," not set apart by punctuation or clarified by syntax, the exclusion creates an ambiguity as to whether it is the "construction defect" or the "property damage" that must have first existed prior to the inception date of the policy.

In sum, coverage is triggered under each of the policies of the insurance companies, and no exclusions to such coverage apply. Accordingly, the court turns to calculation of the defense costs, and remaining issues raised regarding the apportionment thereof.

### iii. Calculation of defense costs

Based on the foregoing, and upon the present record, the court sets forth as follows a preliminary calculation of the allocation of defense costs, defined here to include all attorney fees and costs, excluding the payment of the settlement amount. As warranted, to the extent set forth below, the court will discuss potential issues of fact or gaps in the record precluding at this point a more conclusive calculation.

#### Allocation of Concord West Defense Costs

The Concord West plaintiffs allege construction completed by February 2000, during the time Hartford's policy was in effect, and damages continuing through the date of their complaint, in 2009. Therefore, Hartford, Assurance, First Financial, Harleysville, and First Mercury, all duly noticed of the lawsuit, (see DE 113-10, p. 3), shared equally a duty to defend, and must share equally the costs of such defense. Table 1, below, sets forth the court's calculation of equal shares of defense costs, based on information presently in the record.

**Table 1 - Allocation of Concord West Defense Costs**

| Insurer | Defended with Reservation of Rights? | Defense Costs Reported | Defense Costs Equal Share | Over-/(Under-) Paid |
|---|---|---|---|---|
| Hartford | Yes | None reported | $60,997 | ($60,997) |
| Assurance | Yes | $125,257 | $60,997 | $64,260 |
| First Financial | Yes | None reported | $60,997 | ($60,997) |
| Harleysville | Yes | $179,728 | $60,997 | $118,731 |
| First Mercury | No | n/a | $60,997 | ($60,997) |
| **Total** | **n/a** | **$304,985** | **$304,985** | **n/a** |

As noted in Table 1, above, although Hartford and First Financial participated, in some part, in the defense of Hammonds in the Concord West lawsuit, they have not disclosed in their filings the amount of defense costs expended. (See DE 113-10 p.3; DE 127 p.4; DE 116, p.7). Therefore, the total defense costs, and equal shares thereof, noted in the chart may be preliminary only. Hartford and First Financial are DIRECTED to supplement the record to provide evidence of the amount of their defense costs expended in defense of the Concord West lawsuit, if any, within 21 days of the date of this order. Any other party may file a response within 14 days of filing thereof. If any such response is filed, Hartford and/or First Financial may file a reply within 7 days thereafter. Thereupon, the court will take up final calculation of apportionment of defense costs for the Concord West lawsuit.

Allocation of Southampton Pointe Defense Costs

The Southampton Pointe plaintiffs allege construction completed by June 1999, during the time Hartford's policy was in effect, and damages continuing through the date of complaints filed in 2009. Therefore, Hartford, Assurance, First Financial, Harleysville, and First Mercury, all duly noticed of the lawsuit, (see DE 113-6 p. 8), shared equally a duty to defend, and must share equally

38

the costs of such defense. Table 2, below, sets forth the court's calculation of equal shares of defense costs, based on information presently in the record.

**Table 2 - Allocation of Southampton Pointe Defense Costs**

| Insurer | Defended with Reservation of Rights? | Defense Costs Reported | Defense Costs Equal Share | Over-/(Under-) Paid |
|---|---|---|---|---|
| Hartford | Yes | None reported | $35,524 | ($35,524) |
| Assurance | Yes | $108,559 | $35,524 | $73,035 |
| First Financial | No | n/a | $35,524 | ($35,524) |
| Harleysville | No | n/a | $35,524 | ($35,524) |
| First Mercury | Yes | $69,061 | $35,524 | $33,537 |
| **Total** | **n/a** | **$177,620** | **$177,620** | **n/a** |

As noted in Table 2, above, although Hartford participated in the defense of Hammonds in the Southampton Pointe lawsuit, it has not disclosed in its filings the amount of defense costs expended. Therefore, the total defense costs, and equal shares thereof, noted in the chart may be preliminary only. Hartford is DIRECTED to supplement the record to provide evidence of the amount of its defense costs expended in defense of the Southampton Pointe lawsuit, if any, within 21 days of the date of this order. Any other party may file a response within 14 days of filing thereof. If any such response is filed, Hartford may file a reply within 7 days thereafter. Thereupon, the court will take up final calculation of apportionment of defense costs for the Southampton Pointe lawsuit.

Allocation of Vista Cove Defense Costs

The complaints in the Vista Cove lawsuit alleged that roofing construction on some buildings was first completed in 1999, during the time Hartford's policy was in effect, and construction on other buildings was continuing and completed by about December 2004, during the time

39

Harleysville's first policy was in effect. Damages are alleged to have been continuing up to the time

the suit was first filed, in 2009, during the time of the First Mercury policy. Therefore, because

property damage could have started any time between the Hartford policy and the First Mercury

policy period, all five insurers who are party to this action shall share equally in defense costs.

According to the record in this case, Harleysville incurred $252,057.54 in defense costs after

April 2010, and Assurance incurred $1,477.00 in defense costs, on behalf of Hammonds. (DE 113-

10, p.5). Therefore, on the present record, a total of $253,535 in defense costs must be shared

equally between all insurers, as set forth in Table 3, further below.

Assurance contends, nonetheless, that it should not be obligated to share equally in defense

costs, but rather that it should remain obligated only for the $1,477.00 in defense costs that it already

incurred, based upon its litigation defense work performed after June 9, 2011. Assurance contends

it did not receive notice until that date of claims against Hammonds triggering coverage under the

Assurance policy. Assurance's argument is contrary to the law and record in this case.

Under Assurance's policy, Assurance had the "duty to defend the insured against any 'suit'

seeking . . . damages" because of "'property damage' to which this insurance applies." (DE 41-1,

p. 71). As pertinent here, "suit" is defined as "a civil proceeding in which damages because

of . . . 'property damage' . . . to which this insurance applies are alleged." (DE 41-2, p. 5).

An "insurer's duty to defend is triggered when insurer first receives notice of [a] lawsuit and

not when [the] complaint is filed." Kubit v. MAG Mut. Ins. Co., 210 N.C. App. 273, 293 (2011)

(citing Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 52 F.Supp.2d 569, 596

(E.D.N.C.1999)). As noted previously, "[i]f the insurance policy provides coverage for the facts as

alleged" in a lawsuit, "then the insurer has a duty to defend." Buzz Off, 364 N.C. at 7 (emphasis

added). Id. Further, "pleadings that disclose a mere possibility that the insured is liable (and that the potential liability is covered) suffice to impose a duty to defend upon the insurer." Waste Mgmt., 315 N.C. at 691 at 691 n.2. The duty to defend is triggered "[w]here the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy." Id. at 691 (emphasis added).

In light of this standard, the 2009 original complaint in the Vista Cove action, provided sufficient allegations of "potential liability" against Hammonds to trigger a duty to defend. Waste Mgmt., 315 N.C. at 691 at 691 n.2. The 2009 original complaint alleged defective roofing work on buildings constructed by Vercon, and a then-unidentified roofing subcontractor, between 1998 and 2003. (DE 34-16, p. 28). Alleged water leaks from such defective construction caused damages to the building structures and interior that potentially could have taken place any time after such construction completed, (see DE 34-16, p. 36), including during the Assurance policy term, from October 2001 to October 2002. In addition, the Vercon complaint, filed April 15, 2010, provided further confirmation of what reasonably could be implied from the factual allegations of the 2009 original complaint, particularly that Hammonds was the roofing subcontractor that conducted work on Vista Cove Phase III and IV construction concluding in 2002. (DE 34-18, pp. 6, 7).

The remaining issue is whether Assurance received "notice" of the "lawsuit," Kubit, 210 N.C. App. at 293, in which these triggering allegations were alleged, by April 2010. It is undisputed that "[o]n or about December 3, 2008, Assurance received notice of potential claims that may be asserted against Hammonds in connection with and arising out of alleged construction defects at . . . Vista Cove," as acknowledged by Robert W. Paine ("Paine"), an Assurance claims specialist familiar with the Vita Cove claims file. (DE 135-1 p. 5). It is also undisputed that Harleysville sent

Assurance a letter, dated April 22, 2010, notifying "Assurance that Landsouth Construction, LLC had asserted claims against Hammonds <u>in the Vista Cove Lawsuit</u> and requested that Assurance conduct an investigation into the matter." (<u>Id.</u>) (emphasis added). For purposes of its summary judgment motion, "Assurance has assumed that it received the letter in late April or early May of 2010." (DE 135, p. 7 n.6).

The combination of the information received in 2008 and 2010 constitutes notice to Assurance of a lawsuit alleging damages potentially covered by its policy. Although the April 22, 2010, letter is not provided in the record, and the court must accept the summary provided by Assurance as true, the letter as described nonetheless provides notice of the "Vista Cove Lawsuit." (DE 135-1 p. 5). Even though the letter specifically references <u>claims</u> by Landsouth, the letter also provides notice of the overarching "Vista Cove <u>Lawsuit</u>," which at that point included the original 2009 claims by the Vista Cove Condominium Association and the Vercon third-party complaint. This, alone, was sufficient notice of the "underlying action" to trigger the duty to defend. <u>Kubit</u>, 210 N.C. App. at 293. Assurance's earlier notice of the "potential claims" against Hammonds in 2008 only further confirms it could have, by April 2010, "reasonably ascertain[ed] facts that, if proven, would be covered by its policy." <u>Waste Mgmt.</u>, 315 N.C. at 691.

In sum, by April 2010, Assurance had sufficient notice of the Vista Cove lawsuit alleging damages covered by its policy to trigger a duty to defend. Therefore, Assurance, along with Hartford, First Financial, Harleysville, and First Mercury, had a duty to defend and share equally in defense costs incurred after that point in time, including the $252,058 in defense costs reported by Harleysville. Table 3, below, sets forth the court's calculation of equal shares of defense costs, based on information presently in the record.

42

**Table 3 - Allocation of Vista Cove Defense Costs**

| Insurer | Defended with Reservation of Rights? | Defense Costs Reported | Defense Costs Equal Share | Over-/(Under-) Paid |
|---|---|---|---|---|
| Hartford | No | n/a | $50,707 | ($50,707) |
| Assurance | Yes | $1,477 | $50,707 | ($49,230) |
| First Financial | Yes | None reported | $50,707 | ($50,707) |
| Harleysville | Yes | $252,058 | $50,707 | $201,351 |
| First Mercury | No | n/a | $50,707 | ($50,707) |
| **Total** | **n/a** | **$253,535** | **$253,535** | **n/a** |

As noted in Table 3, above, although First Financial participated in the defense of Hammonds in the underlying Vista Cove lawsuit, (see DE 113-10 p.5; 134-2, p. 9), it has not disclosed in its filings the amount of defense costs expended, or the timing of those expenditures. Therefore, the total defense costs, and equal shares thereof, noted in the chart may be preliminary only. First Financial is DIRECTED to supplement the record to provide evidence of the amount of its defense costs expended in defense of the Vista Cove lawsuit, if any, within 21 days of the date of this order. Any other party may file a response within 14 days of filing thereof. If any such response is filed, Vista Cove may file a reply within 7 days thereafter. Thereupon, the court will take up final calculation of apportionment of defense costs for the Vista Cove lawsuit.

  b.  Indemnification

As discussed previously, while the duty to defend is determined according to factual allegations in the underlying lawsuits, the duty to indemnify is based on "the facts as determined at trial," Buzz Off, 364 N.C. at 7, or in the post-settlement context, the facts as presented upon summary judgment record in a declaratory judgment action. See, e.g., Gaston, 351 N.C. at 297. Here, where the facts of the underlying lawsuits, as presented upon summary judgment, do not differ

43

materially from the facts as alleged in the underlying lawsuits, the outcome regarding trigger of coverage is the same.

In particular, the primary source of additional facts concerning the nature of damages asserted in the underlying lawsuits are three expert reports detailing damages at the Concord West, Southampton Pointe, and Vista Cove, projects. Critically, these expert reports further confirm what was alleged or implied by allegations in the underlying lawsuits, namely that the property damage to interior finishes and structures in various buildings in each of these projects, resulting from intrusion of water, could have started at various times in various different buildings, between the time construction first was completed on any building up to the date of the lawsuits. If nothing else, at a minimum, these expert reports confirm that the date property damage began at any of the projects is inherently uncertain and unknowable, within that overall time frame, in light of the latent nature of the construction defects and water intrusion damage. For example:

1. The Concord West report stated that "the subject structures have experienced long term water intrusion through the roof assembly resulting in moderate to severe damage to the underlying framing components," and "damage . . . to the trim and cladding components," as well as gaps in flashing that have resulted in "localized moderate to severe water intrusion and damage," without suggesting a date when the damage first began. (DE 113-9, p. 14) (emphasis added).

2. The Southampton Pointe expert report noted that several observed types of installation defects "will negatively affect the performance of the roof covering in a design wind event," (DE 118-1, pp. 5, 11, 13, 15), and that several other installation defects "promote[] water intrusion." (Id., pp. 17, 27, 29) (emphasis added).

3. One Vista Cove report states that "[t]he conditions found in these buildings indicate serious water intrusion and resultant structural damage," without suggesting a date such damage began. (DE 34-21, p.1). Another report points to including "[s]tructural damage to wood studs and sheathing," and "mold damage to walls," again without suggesting a date such damages began. (DE 34-20, p. 13) (emphasis added).

The parties did not submit any other evidence suggesting that the dates of damage could be determined with any more certainty than as alleged in the underlying complaints.

Accordingly, as discussed above with respect to the duty to defend, because the date "property damage" began is inherently uncertain, the proper trigger of coverage for purposes of indemnity obligations is not a single moment based upon "date of construction" as Harleysville, Assurance, First Financial, and First Mercury, propose. Rather, as Hartford proposes, coverage is triggered for all policies in effect during the entire time that property damage could have begun, as a result of water intrusion, at any building for which Hammonds performed roofing work in the three projects.

Because the court agrees with Hartford's primary contention that the date "property damage" began is inherently uncertain, the court need not address Hartford's alternative argument that the court should determine, after a bench trial and consideration of further evidence, the date that "property damage" began at each of the three projects. Neither Hartford nor any other party, has forecasted any evidence permitting an inference that the date "property damage" began can be determined, nor what form such evidence would embody.

In this respect, this case is distinguishable from Builders Mutual Ins. Co. v. Mitchell, 210 N.C. App. 657 (2011), cited by Hartford, where the North Carolina Court of Appeals determined that "[w]hether the date [of injury-in-fact] can be known with certainty is a genuine issue of material fact" that could not be resolved without trial. 210 N.C. App. at 664. There, the plaintiff to the declaratory judgment action, Builders Mutual, which sought contribution of settlement costs from a second insurer, Maryland Casualty, produced an affidavit by an expert who opined that there were "damages that happened during the Maryland Casualty coverage period." Id. at 665. He further

opined that "water damage caused by the roofing problems occurred during the Maryland Casualty Period," and that "approximately two-thirds (2/3) to 70% of the damages would have more likely than not occurred [during the Maryland Casualty coverage period]." Id. The court further noted that "[t]he credibility, expertise, and knowledge of [the expert], which was questioned by Maryland Casualty, cannot be settled by summary judgment." Id. No such affidavit, or disputed issues of fact, have been presented in the instant case.

Having determined that all five insurers have a duty to indemnify as to the settlement amounts in the three underlying lawsuits, an issue remains whether the insurers must share equal portions of the settlement amounts or whether some other method of allocation should be used. Hartford suggests that the court should allocate settlement costs on the basis of a pro rata or "time on the risk" share, calculated according to the relative number of months each policy was in effect, from the time of completion of construction through the date of discovery of water damage, including by taking into account multiple phases in the Vista Cove project. The other insurers do not suggest an alternative allocation, although Harleysville suggests that it already paid the proper amount of indemnity in the Vista Cove lawsuit based upon comparison of the number of buildings constructed in Phase V with those constructed in Phases III and IV.

The court declines to adopt the suggestion of Hartford or Harleysville and instead concludes that each of the five insurers must share equally in the settlement costs for each of the three underlying lawsuits. This conclusion is supported by several considerations.

As an initial matter, for those insurers who refused to defend, their obligation to indemnify settlement costs is coextensive with their defense obligation. See In re Abrams & Abrams, P.A., 605 F.3d at 241; Jamestown Mut. Ins. Co., 277 N.C. at 219. As already determined, they must "share

equally in the costs of defending." St. Paul Fire & Marine Ins. Co., 919 F.2d at 241. From this, it follows that "[a]s to the settlements themselves, . . . they should be divided equally between the insurers," at least as between those who wrongfully refused to defend. Id. Thus, as to the Concord West settlement, First Financial and First Mercury should each be obligated to pay one-fifth (20%) of the $1 million settlement. As to the Southampton Pointe settlement, Harleysville and First Financial should each be obligated to pay one-fifth (20%) of the $545,000 settlement. And, as to Vista Cove, Hartford and First Mercury should each be obligated to pay one-fifth (20%) of the $210,000 settlement.

This leaves for determination whether Hartford's proposed "time on the risk" theory of allocation should be used for the remaining insurers, or to otherwise modify the "equal share" obligation of those who refused to defend. Under Hartford's proposed theory of allocation, liability is allocated according to how many months each insurer's policy was in effect as a proportion to the total time period from date of completion of construction to the date of "discovery" or "manifestation" of water damage. (DE 116, p. 22). Thus, for example, Hartford proposes to allocate the $1 million Concord West settlement across 79 months from April 2001 to December 2007, with shares determined by relative extent of each insurer's policy in effect during that time period: 7.5 months (Hartford); 9.5 months (Assurance); 12 months (First Financial); 36 months (Harleysville); 14 months (First Mercury).

The court rejects this approach for two reasons. First, this approach assumes that the time period between date of completion of construction and the date of manifestation can be determined with precision down to a single period of months. At each project, however, some buildings may have been completed before others, and water damage may have manifested in some buildings

47

earlier than in others.  Just as this uncertainty requires equal share of defense costs, it also requires an equal share of indemnification.

Second, "'[a]t the level of greatest generality,' the pro rata method is based on the fact that '[a]n insured purchases an insurance policy to indemnify it against injuries occurring within the policy period, not injuries occurring outside that period.'" Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts, 668 F.3d 106, 113 (4th Cir. 2012) (quoting Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 322 (2d Cir.2000)).  "Under this method of allocation, each insurer is liable for that period of time it was on the risk compared to the entire period during which damages occurred."  (Id.) (emphasis added); see also St. Paul, 919 F.2d at 242 n. 8 (suggesting that "[i]n cases where a court apportions liability between two carriers with different policy terms, but both carriers participated in defending the insured, it may be appropriate to hold each carrier liable for only the injury occurring during its policy."[10]

Accordingly, by this definition, the pro rata method is not applicable here, because it is uncertain whether damages started occurring at all during any one policy period, rather than being certain that damages occurred throughout all policy periods.  It is possible, for example, that property damage, in the form of damage to some building structures and finish, did not first take place until the Harleysville policy period or even the First Mercury policy period.  In light of the uncertainty in the timing of damages, an "equal share" allocation, which apportions that uncertainty

[10]  Sybron Transition Corp. v. Security Ins., 258 F.3d 595 (7th Cir. 2001), cited by Hartford, is less helpful to the determination at issue because, in that case, the parties all agreed that "a time-on-the-risk approach to allocating insurance coverage for diseases with long latency periods" applied. Id. at 597. Further, while Sybron justifies the "time-on-the-risk" method on the basis of "uncertainty in the timing of cause and consequence," 258 F.3d at 601, Olin, upon which Sybron relied, involved application of the "time-on-the-risk" method where a jury had made express findings of both the start and end date of injury to property.  See Olin, 221 F.3d at 325.

48

between all insurers who had policies possibly triggered by the asserted damages, is the most equitable approach to allocating settlement costs.

Next, the court turns to Harleysville's suggestion that the court should allocate indemnity in the Vista Cove lawsuit based upon comparison of the number of buildings constructed in Phase V with those constructed in Phases III and IV, consistent with the manner that Harleysville allocated its settlement obligations with First Financial (DE 113, p. 24 & 26 n.22). Specifically, Harleysville contends it paid the proper amount of indemnity based upon the number of buildings in Phase V of the Vita Cove project on which Hammonds completed its work during the Harleysville policy period. It notes that of the 20 buildings at issue in Phases III through V in the underlying Vista Cove lawsuit, 10 were completed during the period of time that the Harleysville policies were in effect. Thus, Harleysville contends it properly paid 50% (or $105,000) of the overall settlement (totaling $210,000).

Harleysville's suggestion is unavailing because it is premised upon its theory that coverage is triggered solely by the "date of completion" of construction. As the court determined previously, while construction in Phases III and IV was completed <u>prior</u> to the date of Harleysville's policy, the "property damage" in Phase III and IV buildings, in the form of water intrusion and exposure to interior structures, may not have started until the time period of Harleysville's policy. Therefore, where that start date of damage is uncertain, Harleysville must share equally in the indemnity costs.[11]

---

[11] To the extent Harleysville and First Financial are relying upon prior agreements to allocate defense and/or settlement costs with respect to Vista Cove, as reported by Harleysville and First Financial in their briefs (albeit not reflected in any admissible evidence in the present record), (DE 113, p. 27 n.22; DE 127 n.2), Harleysville and First Financial – and any other parties similarly subject to private cost allocation agreements – of course may between themselves allocate their own defense and settlement costs accordingly. The court nonetheless provides in this order an assessment of the proper allocation of defense or settlement costs, without adjusting for any private agreements between the parties as to allocation of defense or settlement costs.

A closer question arises whether Hartford, Assurance, and First Financial, should be entitled to a proportionate reduction in indemnity obligation for the Vista Cove lawsuit, for any damages taking place only on Phase V buildings. It is undisputed that the Phase V roofing work started and finished for all Phase V buildings in 2004, after the policies of Hartford, Assurance, and First Financial had expired. Therefore, as Hartford suggests in its brief, Hartford, Assurance, and First Financial, could be subject to indemnify for settlement only for property damage for Phase III and IV buildings, but not Phase V buildings.

The court rejects this suggestion as well, however, because the indemnity obligation for the Vista Cove lawsuit covers the settlement for the entire lawsuit, which is not broken down on the basis of whether it settled claims asserted in the Vercon third-party complaint, Landsouth third-party complaint, or the 2011 amended complaint. Moreover, notwithstanding Harleysville's statements in its own brief that it paid 50% indemnity of the $210,000 settlement amount on the basis of Phase V construction, which is not in itself evidence, there is no evidence that this allocation of indemnity reflected claims for property damage in Phase V buildings. While it could be assumed that a certain amount of damages were incurred in each Phase's buildings, allocation of indemnity obligations on the basis of such assumptions would be speculative and uncertain. As with all other defense and indemnity obligations in this case, this uncertainty is best addressed by having indemnity "divided equally" among all insurers with a coverage obligation. St. Paul, 919 F.2d at 241.

Therefore, the indemnity obligations for the settlement payments in each of the three underlying lawsuits shall be allocated equally as follows, in tables 4, 5, 6, below:

50

**Table 4 - Allocation of Concord West Indemnity Obligations**

| Insurer | Defended with Reservation of Rights? | Settlement Payments Reported | Indemnity Equal Share | Over-/(Under-) Paid |
|---|---|---|---|---|
| Hartford | Yes | $333,333 | $200,000 | $133,333 |
| Assurance | Yes | $333,333 | $200,000 | $133,333 |
| First Financial | Yes | None reported | $200,000 | ($200,000) |
| Harleysville | Yes | $333,333 | $200,000 | $133,333 |
| First Mercury | No | n/a | $200,000 | ($200,000) |
| **Total** | **n/a** | **$1,000,000** | **$1,000,000** | **n/a** |

**Table 5 - Allocation of Southampton Pointe Indemnity Obligations**

| Insurer | Defended with Reservation of Rights? | Settlement Payments Reported | Indemnity Equal Share | Over-/(Under-) Paid |
|---|---|---|---|---|
| Hartford | Yes | $355,000 | $109,000 | $246,000 |
| Assurance | Yes | $130,000 | $109,000 | $21,000 |
| First Financial | No | n/a | $109,000 | ($109,000) |
| Harleysville | No | n/a | $109,000 | ($109,000) |
| First Mercury | Yes | $60,000 | $109,000 | ($49,000) |
| **Total** | **n/a** | **$545,000** | **$545,000** | **n/a** |

**Table 6 - Allocation of Vista Cove Indemnity Obligations**

| Insurer | Defended with Reservation of Rights? | Settlement Payments Reported | Indemnity Equal Share | Over-/(Under-) Paid |
|---|---|---|---|---|
| Hartford | No | n/a | $42,000 | ($42,000) |
| Assurance | Yes | $32,500 | $42,000 | ($9,500) |
| First Financial | Yes | $72,500 | $42,000 | $68,300 |
| Harleysville | Yes | $105,000 | $42,000 | $63,000 |
| First Mercury | No | n/a | $42,000 | ($42,000) |
| **Total** | **n/a** | **$210,000** | **$210,000** | **n/a** |

In sum, based upon the present record, prior to any supplements to the record as discussed above with respect to defense costs paid, the total amount overpaid or underpaid for each insurance company, aggregating the total obligation from each of the three underlying lawsuits, may be summarized as set forth in Table 7, below:

**Table 7 - Total Defense and Indemnity Obligations**

| Insurer | Total Defense Obligation Share | Total Defense Obligations Paid | Total Indemnity Obligation Share | Total Indemnity Obligations Paid | Net Overpaid or (Underpaid) |
|---|---|---|---|---|---|
| Hartford | $147,228 | None reported | $351,000 | $688,333 | $190,105 |
| Assurance | $147,228 | $235,293 | $351,000 | $495,833 | $232,898 |
| First Financial | $147,228 | None reported | $351,000 | $72,500 | ($425,728) |
| Harleysville | $147,228 | $431,786 | $351,000 | $438,333 | $371,891 |
| First Mercury | $147,228 | $69,061 | $351,000 | $60,000 | ($369,167) |
| **Total** | **$736,140** | **$736,140** | **$1,755,000** | **$1,755,000** | **($1)** |

The balance of $1 remaining underpaid in Table 7, above, is due to rounding in the Ashley Knoll settlement payments. The court will reserve final ruling and entry of judgment pronouncing final assessment and declaration of relief, pending filing of supplemental information from Hartford and First Financial, as discussed above.

## CONCLUSION

Based on the foregoing, Hartford's motion for summary judgment (DE 114) is GRANTED IN PART, as set forth herein. Hartford's motion to seal (DE 121) is GRANTED. Harleysville's motion for summary judgment (DE 111) is GRANTED IN PART, as set forth herein solely regarding defense costs in the Vista Cove lawsuit. The remaining motions for summary judgment (DE 110, 117, 126) are DENIED. The court's preliminary assessments of the parties' responsibilities for defense costs and indemnity towards settlement payments are set forth at Tables 1 to 7, herein. As specified in the discussion thereof, before the court may enter judgment pronouncing final assessment and declaration of relief, Hartford and First Financial are DIRECTED to supplement the record to provide evidence of the amount of their defense costs expended in the underlying lawsuits, if any, within 21 days of the date of this order. Any other party may file a response within 14 days of filing thereof. If any such response is filed, Hartford and/or First Financial may file a reply within 7 days thereafter. Finally, the clerk is DIRECTED to CLOSE the case file in Case No. 7:11-CV-98-FL.

SO ORDERED, this the 26th day of February, 2015.

_____
LOUISE W. FLANAGAN
United States District Court Judge